Our next case is 18-1614 Sengenta Crop Protection v. Willowood, LLC. Let me make sure I have this correct. Mr. Levine, you reserved eight minutes of your time for rebuttal. Mr. Tiller, you're splitting your time with Ms. Barbaro, and so you have 15 minutes, and Ms. Barbaro has five minutes for her argument. Okay. All right, so you may proceed. May it please the Court, I am going to focus my time on three of the issues that are in the briefs, the copyright issue, the 271G statutory interpretation issue, and the verdict issue. With respect to the copyright issue, the District Court erred in two respects. First, the Court erred by holding that FFRA precludes copyright protection for the required elements of a pesticide label. Second, the Court then erred by dismissing Sengenta's claims in their entirety, thereby preventing Sengenta from proving copyright infringement with respect to the non-required elements of the pesticide label. Fifth, for its plain language, the regulations and guidance interpreting it do not require pesticide registrants to copy the original registrant's labeling. The plain language states that the EPA shall, as expeditiously as possible, act on an application, including one that contains language that differ in composition and labeling from the original registrant's labeling. I have two questions for you on the point you just made. One is, you've distinguished Smith-Klein on this very basis that you've stated here, but do you think Smith-Klein was correctly decided? Under the statute that Smith-Klein was decided, yes, it was correctly decided. Because in the Smith-Klein case and in the Smith-Klein statute, the Hatch-Watchman Act placed the burden on the applicant to show that the labeling for its new drug was the same as the labeling approved for the Lister drug. Whereas under FFRA, the burden is on the EPA to review the So does FFRA require identical labels then? Not required, but the whole statute contemplates that what we're looking at here are Me Too applicants, and they're Me Too applicants because they come forward with essentially an identical and substantially same label. No, not an identical and substantially same label. They come up with a product that utilizes an active ingredient, and in that sense it's a generic of the pesticide or herbicide or insecticide. But what FFRA says is that the label can be identical or substantially similar in the sense that there's permission that the Me Too applicant has. If they have essentially the same composition, two fungicides that are the same, substantially the same, why under FFRA would they not bear essentially the same label? Because there are many different ways to express and to convey to the users of those pesticides. FFRA contemplates, this has already been done before, we've already gone through the process, let's speed up the process, let's facilitate the process, so you show up with a Me Too, you're a Me Too, you show up with essentially the same label, and you're going to get an expedited process. But you can get an expedited process under the plain language of FFRA even when there is differences in the labeling and composition. That comes right out of the statute. Can I ask you, this is my second question, what are we talking about in terms of the amount of time? What is an expedited review? What's a regular review? I think I read somewhere in the record, or maybe it was one of the other cases, that even under a non-expedited review, it took a month. I'm just trying to get a sense of what time we're talking, the amounts of time we're talking about. Generally speaking, I can use an example in this case, when Willowwood itself modified its label, and the EPA said, well, you need to make some more modifications to it. This was after we asserted copyright infringement. Both labels were revised and approved in under a year. And in the expedited review context, oftentimes it's in the 90-day time frame. But the EPA has the resources. The EPA is certainly capable of looking at the labels, as the label review manual says, make a case-by-case determination on the acceptability of the language to ensure that it's conveying to the users what we, the EPA, wanted to convey. There is no requirement in the statute, in the regulations interpreting it, or in the guidance, as the label review manual is, saying you have to use the same language. I think, roughly speaking, nobody has suggested that identity is required. Rather, the argument is that in the context of this expedited review procedure, the policy is for expedition. And as a practical matter, expedition is at least enabled in a practical way by allowing either identity or something awfully close to identity, so that the EPA, as it says in its label manual, can put the labels side-by-side, identify quickly any changes, and then focus only on those small number of changes and ask, is that conveying misinformation or bad information? But the statute says they can do that in two contexts. When there's substantial identity, either because there's permission, there's a license, because these entities have a lot of interactions with each other, potentially, and there are opportunities. Sometimes it's a customer-supplier situation where the original registrant is providing the active ingredient to the generic. They could negotiate for a copyright license. They could negotiate for a copyright license independently. But most importantly, the FFRA statute itself says that the EPA, the administrator, shall act as expeditiously as possible. But the EPA says here, I'm going to summarize, we can't, as a practical matter, do that if we have to get labels that are, as a result of copyright considerations, very likely to be quite different in wording from the pioneer label. That's a policy argument, Your Honor, that ought to be directed to Congress. And the FMC decision decided in 2005, 14, 15 years since then, the sky hasn't fallen. The EPA has still been approving applications, and there's no evidence in the record that there's been any lack of expeditious approval or that generics have not been able to obtain the approvals in order to enter the market. So you think different labels are okay? Different labels are okay because that's what the statute and the regulations say. Why does Syngenta assert copyright infringement against the changed labels that they have? Because the changed labels are still copying. They still copied what Syngenta created in terms of the wording, the arrangement, and the layout. And that's why Syngenta was asserting with respect to the revised labels. There are many different ways to convey the directions of use, the other information that is contained within the label. It sounds like you want to have your cake and eat it, too. I mean, on the one hand, you're saying that having different labels is okay under FFRA, and yet when that happens, when your competitor comes up with a different label or a changed label, you bring a copyright infringement. What is the difference between the labels? What is the difference? What is the difference? Is it just the changing name? In the original label, they did simply change the name. And in some instances, they didn't even change the name from Syngenta to Willowood. But there could be all sorts of differences with respect to how you convey the required pieces of information. My question, though, was more specific, which is just, what are the differences between their original label they submitted and their changed label that they submitted that nonetheless contends still infringes your copyright? They tried to paraphrase, and they simply didn't paraphrase enough. And, you know, that's the primary issue here is that they tried to change some of the words from being the identical verbatim copying to paraphrasing, but they stayed too close and need to go further. And so what's the, you know, easily administered enough paraphrase standard that you contemplate is going to interact well with the FIFRA expedition regime? Well, what the statutes are requiring is that what the EPA is to do in reviewing the labels is to make sure that the terms used, and this comes out of 40 CFR 156.10, can be easily read and understood by the average person likely to use or supervise the use of the pesticide. So there is an element of judgment here, and the EPA is more than... Do you contemplate that the EPA will consider the copyright question, or that's entirely up to the applicant? The copyright issue is up to the applicant. And the EPA actually has a congressional mandate, shall we say, to expeditiously process these things. And applicants are going to have to figure out how much paraphrase is going to satisfy the pioneer. Correct, or come to the original registrant and obtain a license. And the second problem here with the district court's holding is that she then dismissed the entirety of Syngenta's copyright claims. Where do you make that point in your blue brief, that even if the judge was right about FIFRA, ousts the Copyright Act as to, let's call them, required elements. And here required means not just required of the pioneer, but required of the generic once there's a pioneer, which is a much larger class, because there has to be at least substantial similarity. Where do you make the argument that even if the judge was right about that, that the judge incorrectly dismissed the copyright claims as a whole? Correct. Where do you say that in your blue brief? In the page numbers? Yes. I'm looking for it in the heading. I don't see it, so I want help. Okay. I will get you the page number itself. The concern is whether you've raised it or not, so that's why we want to know where it is. Okay. The page number itself, because what I can say, Your Honor, is that we highlighted the portions of the label they copied. They then marked up the label saying these are the required portions, and what's left is substantial portions, the efficacy claims. Do you agree with what they marked up as being the required portions? No. Do you have somewhere in the record where you've identified what you think are the required portions? No, because the case was dismissed before we got to that. I will get you the page number site, Your Honor. I just want to be absolutely sure you understand what I'm asking. Let me put it tendentiously. When you began your argument by saying the district court was wrong by saying FIFRA ousts the Copyright Act as to FIFRA-required elements, and the district court was also wrong in dismissing your copyright claims even as to non-required elements, I immediately thought, boy, I don't remember hearing from or reading in your blue brief the second argument, so I don't care about the joint appendix. I want a citation in the blue brief where you said even if required claims are required aspects of the label are ousted, the district court was still wrong, and we want a vacator on that ground. Okay, I'll get you that site and rebuttal. On the 271G issue, the plain language does not require the product made by the patented process to be made by a single entity. Liability arises from the importation, use, sale. Can I just ask this? Let me stipulate for current purposes that the language of the statute favors you, including 271G and including 154A2. Nevertheless, there is a concern reflected, I think, in a different context, most recently in the Supreme Court's Helsin decision that when preexisting law establishes certain kinds of limits on patents, at least in that direction, that we expect a fair degree of eyes-open clarity, maybe even expression of intent to change something clear like that. Do we have that here or is that not the right question to ask? Well, we certainly don't have here a clear expression to impose a single entity requirement on 271G because 271G is using the passive voice. It talks about whoever imports, offers to sell, sells, or uses. Maybe I can focus it this way. Assume with me that the statutory language here treats foreign and domestic manufacturer identically, as indeed the language appears to do. Then 271G, in your view, would quite dramatically change the scope of protection for a domestic process patent if it was true before 1987 that you had to have a single entity practicing the process patent. No, because they're treated identically with respect to whoever uses, offers to sell, imports, or sells. That's identical between 271A and 271G. There may be a case of divided importation. The single entity requirement would apply there. But 271G, the act of infringement, is the act of importation, use, offer to sell, or sell. The product made by the patented process is not the focus of 271G. I think the concern is that if under 271A you have to have a single entity, the concern would be that if 271G could apply to a domestic process that actually results in a product, you might have a different rule applying in 271A, where you have to have a single entity requirement, in 271G, where you wouldn't have to have a single entity requirement for the performance of the process steps. And so the question is, does that create a problem for you in terms of your argument? No, it doesn't, because under 271G, the act of infringement, what creates liability, is whoever imports, uses, offers to sell, or sell. That single entity requirement is the same as it would be in 271A. As I understand it, your point is Congress wrote what they wrote, and 271G has a different reading than 271A, so it doesn't matter. Because that's how Congress wrote it. It doesn't matter if you might have two different situations. That's certainly true. The two statutes can be interpreted differently, just like 271F has got the language in it that limit it to in a manner that would infringe if it was performed in the U.S. There's no such language in 271G. So Congress in 271G was closing the loophole, but to the extent there's a single entity requirement in 271G, it's with respect to the act of infringement, which is the importation, use, and sale. I'll reserve the remainder of my time for rebuttal, and I'll give you the page number. Hold on. Any other questions? You said you had three points, and I think you've only addressed two. Yes, in the interest of time. I'll adjust time accordingly. Is it about Willowwood Limited? Excuse me? Is that about Willowwood Limited? Yes, the verdict issue. We owe a fair bit of discretion, don't we, to the district court's interpretation of her own jury verdict? I thought we said that in PRISM and Telecordia, which is, I think, fairly standard law. Yes, but this is not a situation where there was a need to resolve any type of ambiguity under the jury verdict. What the district court had reasoned was that neither party had asked the court to submit a separate issue with respect to the question of infringement of the 138 and 761 patents as it related to Willowwood Limited. But Willowwood did, in fact, propose such a jury instruction, and Syngenta objected to that proposed jury instruction. The court's final instructions did not utilize the instruction proposed by Willowwood. And in the final instructions, Willowwood only objected to the jury instructions with respect to the 761 patent as it related to the burden-shifting aspect, putting on Willowwood the burden under Section 295 to prove non-infringement. The verdict form then, in Question 7, asked the jury the question, did defendants prove non-infringement? And the jury responded, no, they did not. And significantly, Willowwood did not object to the verdict form with respect to Question 7. Willowwood only objected to the verdict form with respect to Question 1, with respect to whether the three entities should be broken out with respect to the willfulness question. And in discussing that objection, the district court expressly stated, quote, we certainly treated them, referring to all three Willowwood entities, altogether for all purposes except the infringement of this compound patent question, close quote. And counsel for Willowwood agreed. That's at A7066. So the jury then returned a verdict, finding that the defendants infringed the 761 patent. And defendants included Willowwood Limited. And the court erred by then limiting the verdict to just Willowwood USA and Willowwood LLC. And that's why... Can I ask you a very practical question? Sure. Why do you care how many Willowwoods are liable? Because Willowwood Limited, we want them under the permanent injunction. Willowwood Limited is the source of the Azoxi Technical. They sell the technical to Willowwood USA. Willowwood Limited might also sell the technical to other entities. And we want Willowwood Limited included in the permanent injunction. So in case Limited and USA change their exclusivity agreement. Correct. Or, you know, if there's other things that Willowwood Limited does that engages in infringing conduct here. Okay. Thank you. Thank you. Counsel, I was just going to say, I think maybe your blue brief has some suggestion at page 25 footnote 6. I don't know. Yeah, I'll get the exact page numbers. Okay, Mr. Tiller. May it please the court. And I want to start by apologizing. I'm battling a cold that is... I may cough a little bit here. Your Honor, I want to focus on the 271G issue right now. As I think was made clear in our brief and as I think was raised in the court's questioning, 271G did fill a hole. It allowed United States process patent owners to sue when the process is engaged in outside of the United States. And the product resulting from that comes into the United States. There's no dispute here that the entire process is undertaken abroad. By two different entities, no. There is no dispute that the process is undertaken abroad. I have another question here. Does the record reflect, and I went through the record, and I wasn't able to find as to who the importer of record is. The importer of record is Willowwood USA. And... Okay. There was testimony to that at trial from Willowwood USA's president, Mr. Brian Hines. There's a little bit of conflict in testimony as to who's handling the freight forwarding, who's handling the shipping, and... But I did see the testimony that Willowwood USA handled customs. And I noticed on some of the invoices I was able to pull out that Willowwood is the assumed liability for the entire shipment from China to the buyer. Is that correct? Wait. Which Willowwood? I'm sorry. USA. Willowwood... Yes. Yes. I just wanted to make sure. Willowwood USA assumes liability. Willowwood USA, to get down into the details, Your Honor, Willowwood USA tells Willowwood Limited, get it to this port, use this shipper. Willowwood Limited then does that, gets it to the port in Hong Kong or Shanghai. Then Willowwood USA pays for it, picks it up at the port, typically in California, and then arranges for everything else to happen after that, including EPA registrations, as we know, arranging for production of venues, products, and formulation. So the importer record is a term of art in customs law. And you said that they are the importer record. Is that a concession here on behalf of Willowwood? Well, I think Willowwood USA imports. I'm not sure about the exact terminology or the term of art here, but it is Willowwood USA. Who's the official importer of products? Who imports. What customs law would you say? And takes it through customs. That's what I was just about to say, Your Honor. That is Willowwood USA who handles that. Can I ask you another, at least to my mind, very small question? FOB Hong Kong. Is that a term that can be used if the goods never appear in Hong Kong but go through Shanghai? And was it? I think typically most of the goods went through Hong Kong, but some would go through Shanghai, and they would be FOB Shanghai in those particular situations. You don't say FOB a place that the goods never appeared at, right? Correct. Correct. I think the party sort of focused on FOB Hong Kong as FOB not here in the United States, if that makes sense. It's a new technical term. That is a new technical term. So going back to the 271G issue, in 271A, this court held that there's a single entity requirement because whoever performs these verb acts. And so that whoever had to be a single entity or one party directing or controlling another. But here, the 271G language, when it talks about whoever, it's not the process steps that they're talking about. It's other actions like importing. So how do you respond to that? I respond in a couple ways, Your Honor. First of all, if you look at the legislative history of 271G, it was very, very clear what 271G and 154A1 were trying to get at. It was trying to take care of the problem of processes taking place outside of the United States and then the resulting product coming into the United States. But it doesn't say using a process that if it were performed in the U.S. would infringe in the U.S., right? You are right. It doesn't use that 271F language. But I don't think it needed to. Because the implication here is that the importation or subsequent sale or offer to sale under 271G that might create liability under 271G, I think the clear implication here is that there was infringement of the patent in the first place. Without infringement, the importation of a non-infringing product does not rise to any liability. It doesn't say that it infringes a process. It says that it was made by a process. You are correct, Your Honor. Well, what about this? Let me ask you something. What came first, this court's emphasis and discussion of the single entity rule, starting with I think it was BMC might have been the first case or Muni Auction, or was it the passage of 271G? I think it was 271G, if I understand it correctly. But I think, again, what was contemplated under 271G is the idea that we're going to give process patent holders the same scope of protection, whether the process is engaged in the United States or whether the process is engaged in outside of the United States with a product coming in. And I think that is made clear by the legislative history. 271G legislative history says the process patent bill, which resulted in 271G. Their view would, in fact, give those two situations the same scope of protection on the assumption, which I guess I'd like you to indulge, that made by a process under 271G includes made in the United States by a process. Let's call it fractured manufacturing, which is to say manufacturing that wouldn't satisfy Akamai. In the U.S. under the made by the process language, it doesn't say whether that manufacturing occurs abroad or here. You know, there's a section in Chisholm that says just there's no difference according to where the manufacturing is. So now the only question is, who's doing the selling? Is the selling or the importation of the resulting product going on in the United States? If I may ask, Your Honor, to make sure. Are you suggesting that if the single entity rule is not required for domestic process patent infringement that then, given Syngenta's understanding of 271G, the scope would be the same? Yes, that's right. I think if this court was inclined to say there is no more single entity rule, that the… For 271G. For 271… For 271G, for the process. If the single entity rule is not found to apply to 271G but remains applicable to 271A and B, then there would be a different scope of protection for the same process patent under that circumstance. Right, but not a foreign domestic difference. It would just be a difference according to whether a product resulted from the process or a process that didn't produce a product, so that 271G just would have nothing to attach to. I have to admit, Your Honor, I'm not sure I'm following the question, but what I want to say is that obviously 271G only applies if it's going on outside, if the process is being conducted outside of the United States. I would say that's not obvious. Excuse me? I would say that's not obvious. Okay. There's no language in the statute to that effect, is there? Whoever without authority imports in the United States or offers to sell or uses within the United States a product which is made by a process patent in the United States shall be liable. You are correct. Right. You are correct. So even more so, that we then would have two different guidelines of law, one applying a single entity rule and one not applying a single entity rule. The difference between 271A and 271G being maybe one only applies – 271A would apply to all processes and 271G would only apply to processes where there's a product. Where there's a product. It's not the case in all processes, right? That is probably true, Your Honor. Yes, that is true. But I still think we would be essentially setting out two different areas of case law where 271A, where there's, again, as you say, no product ultimately involving, would require a single entity. Whereas, where a product does result, that there would be no requirement of a single entity. Because of the difference in the way the statutes are written. Assuming that this court found in that way, absolutely. And then what I think would be happening is we would be giving process patent owners different levels of the scope of their protection dependent on sort of the invention that they are creating. Whether the invention ultimately comes up with a product. Why didn't 271G do exactly that? Because, Your Honor, I think that would be inconsistent with the idea that 271G, when you read the legislative history, was trying to essentially fill in this loophole. Where it was trying to say, if a product is made outside of the United States and you import it into the United States, such as the case here, that you can still get infringement. You can still find liability. The problem you're having with your argument is you're asking me to look at the legislative history, figure out what Congress had in mind, instead of looking at the plain language of the statute. You are correct, sir. Although, I would argue that the plain language of the statute is still pretty clear. And to say, and one of the NYIPLA amicus brief comes right out and says it. They say, 271G does not require infringement. That's a quote from the NYIPLA. I'm sorry. Does not require infringement of the process patent in the 271A sense? The NYIPLA says that there is no infringement requirement. That's the quote that they use. There's no infringement. I'm sorry. 271G defines a form of infringement. Correct. What I'm getting to, Your Honor, is the amicus brief talks about, yes, 271G requires certain things to happen. But it doesn't require the underlying infringement of the process patent, i.e., it doesn't require a single entity. And if you think about it that way, to impose liability because one company, let's assume for a minute there is no single entity directing or controlling the overall activities. To impose liability on one company that's engaging in only part of the invention. And another company that's only engaging in a part. But they wouldn't. The question would be who's importing or offering to sell or sell. That would be the party that would be liable under 271G. That is. So why are you concerned about the foreign or domestic manufacturers that are only performing parts of the steps of the process patent? I don't understand how that comes in. But the point, Your Honor, is the invention. As the Supreme Court said in Akamai, the reason for the single entity rule is because the invention is not being violated. The patent is not being violated. Right. Okay. So in 271A, the violation is described as whoever makes, uses, or sells the process. Correct. But the violation, the act of infringement in 271G is whoever imports, offers to sell, or sells a product made by process. So there is still an infringing act. It's just defined differently. I agree with that, Your Honor. I don't dispute that. But still, the underlying patent, what the invention is, what the patent holder has a right to exclude others from, is the right to engage in all of those steps. And that isn't occurring under that interpretation of 271G. Even in the, I guess, your 761 example where there's no divided anything, right? Taher just does that one step, right? So there's no divided anything. The U.S. seller, while Willowwood, USA, doesn't do a single aspect of the underlying process. Completely different entities. But 271G, I think, more or less undisputedly would cover that. If it was just the one entity that did it? You've got two entities, a process performer and a domestic seller. Domestic seller doesn't go anywhere near the process. Just buys the product and then sells it. So what's odd about 271G plainly gets the domestic seller? I agree with that, Your Honor. I don't dispute that at all. But what I'm saying is the invention, what is claimed by the patent holder, what the patent holder came up with, this revelation that he or she had, protects a certain number of steps put together. And by not imposing a single entity rule, you would be giving broader scope of protection to that invention merely because the product resulting from those steps occurred but didn't occur through a single entity. Hope I'm making myself clear there. I did want to quickly address, and I see that I'm coming out of time. The Willowwood Limited, the jury verdict question, may I? Yes. Thank you, Your Honor. The point is the entire trial was tried to figure out whether Willowwood Limited engaged in any activities that would subject it to jurisdiction in the United States. The jury, we talked about what it did with regard to the 138 patent that's the subject of the 271G issue, the subject of the 791 patent. And we discussed all of that issue and the jury came back and said, you didn't do, you, Willowwood Limited, didn't do anything. Can I ask you a question related to this, which is, what evidence is there in the record that the sale of the five kilograms of a Zoxistrobin, I hope I said that right, took place outside the U.S. other than the FOB Hong Kong? Because Mr. Hines testified, all the things that we talked about a couple minutes ago, that Willowwood USA arranges for, tells Willowwood Limited, drop it off here, go with this shipper, send it over, do this. He testified that that was true for everything, including the five kilograms. I understand. I want to know, so you're saying there's more than just the FOB Hong Kong? Absolutely. In the record. Absolutely. And that is the testimony of who is directing what? That was the testimony of both Mr. Hines and the gentleman that we referred to during the trial as SSJ, Shen Zhaozhen. They both essentially testified to the same arrangement between Willowwood Limited and Willowwood USA as to everything. Okay. We thank you. Thank you. Counselor Barbaro, you have five minutes, and we'll extend you a little bit of time if you need that as well. Thank you, Your Honor. May it please the Court, Megan Barbaro on behalf of the United States. In FIFRA's Me Too scheme, Congress set up a system to encourage copying of pesticide labels. It wrote the words identical or substantially similar, selecting effectively the test for copyright infringement to describe the labels that the generic should use to get the expedited review from EPA to encourage competition and expedite generic entry to the market. Now, Congress didn't write those words in a vacuum. Can I ask you something? These provisions you're talking about, we've had the Copyright Act and FIFRA's Me Too provision operating together for the past 30 years. What sort of problems have arisen? I mean, there's this case, but it seems kind of odd to me that 30 years of coexistence and now all of a sudden there's problems. So how do you speak to that? Why doesn't that show that these two statutes can coexist? Your Honor, two responses. I do want to get to the actual problems, but also a decision from this Court finding for Syngenta that brand names could sustain copyright infringement claims against generics would clearly create a host of problems and undermine the expedited review scheme that Congress set up. Your point is this? We don't have a Court of Appeals decision upholding copyright infringement claims on a generic label against a generic label. Can I ask you something? Oh, of course. So there's the Eastern District of Pennsylvania case. You're saying that hasn't created any problems because it's a district court case, I guess. And you're saying that nobody has filed copyright claims before, so it hasn't been a problem. Is that your position? No, Your Honor. And let me clarify. The Eastern District of Pennsylvania case in FMC has created problems for the agency. They're problems akin to the problems you see in the record in this case, which is you have generics who are trying both to satisfy the many requirements of FIFRA in the label and also, as Willowit did here, trying to avoid copyright infringement claims. That requires EPA to go back to the generic label and say, you can't make those changes you're suggesting because they don't meet the FIFRA standards. There's a lot more back and forth between the agency and the generics. In addition, we've seen other district court litigations. The United States has filed statements of interest and participated in those cases. We don't have a Court of Appeals decision. But in addition, we know what Congress wanted was expedited review of these, the MeToos, because in Section 7 U.S.C. 136 W-8, which I understand is re-upped by Congress every 5 or 10 years, there are tables there that talk about the specific time frames. Now, if you have a new active ingredient, the agency has up to 24 months to review and approve. With the MeToos, the statutory framework allows only 4 months. And that makes sense because what Congress understood is that there would be a purpose to having the same label when you had the same underlying ingredient. These labels are intended to communicate important health and safety information. And EPA allows the generics to market their generic pesticides as having the same active ingredient as brand name X. Why doesn't the free-for-contain language that requires a MeToo to have identical language as the other label? It does use the words identical or substantially similar. It also has the phrase differ in ways that don't substantially increase the adverse effects on the environment. The language seems to permit it to use identical, substantially same language. It doesn't say, it doesn't require them to do that. But, of course, when Congress wrote the words identical or substantially similar, it understood that if generics submitted such labels, substantially similar labels, that those labels would infringe the copyrights in the original 30- or 50-page label for the brand name. And Congress can't have intended... When you said Congress understood, is there legislative history evidence of that understanding? Or just it must be the case because everybody knows that labels are... The legislative history... Is there evidence that copyright was on the minds of the powers that be? This statute is the same as the Hatch-Waxman amendments that the Second Circuit addressed in Smith-Klein-Beacham. To the extent there is not legislative history, but... The language is a little bit different.  The language there is that the Second Circuit there said, had Congress considered this intersection between copyright and the Hatch-Waxman amendments... It was sort of an attributed intersection. Yes. The Second Circuit had no doubt that Congress there to satisfy the purposes of the Hatch-Waxman amendments, which are very similar in terms of facilitating generic entry to the market, to fiffer that Congress would not have wanted the generics to be held up in copyright litigation. Which came first? Fiffer or Hatch-Waxman? I thought fiffer was... I thought the Me Too provision was prepared first. Am I wrong? I would have to check, Your Honor. I thought that was 1988. Does that sound right? The Me Too provision... 1984. Okay. So the Me Too provision is 1988. That's correct. So that would post the Hatch-Waxman amendment. And maybe even originally in some original Hatch-Waxman proposals, chemicals were included and it was carved out. It's possible, Your Honor. But here, of course, we know from the legislative history that is cited in pages 8 and 15 of our brief that Congress intended to fast-track generics onto the market. And, of course, EPA can't do that unless the labels are substantially identical. Now, under Syngenta's view, when Congress wrote those words, identical or substantially similar or differing in small ways when we're talking about communicating important health and safety information, that that was setting up a copyright trap for the unwary. And that can't be what Congress had in mind. It really is, Your Honor, the idea of reconciling and harmonizing these two statutes. We have this specific Me Too... Can I ask you about that? There's something on its face a little bit uncomfortable about saying, we're going to find a kind of implied repeal, an ouster of one statute by another, when the to be ousted statute has a safety valve built into it, at least one, the fair use. Why on a kind of statutory equivalent of constitutional avoidance shouldn't we send this back for fair use to be addressed? Because then you wouldn't have a conflict or the conflict would be defined and shrunk. You would simply have when there's a certain kind of activity encouraged this much by another statutory regime where the underlying economics doesn't seem to have anything to do with the speech itself, that then they would be actually quite harmonious. Well, Your Honor, we have argued fair use in the alternative. I would encourage the court, if you decide the case on fair use grounds, to announce some broadly applicable principles that will be of use in future cases. One problem for fair use is language, at least in cases that suggest it's kind of case specific and maybe a court of appeals deciding it for the first time on its own in a categorical way when there hasn't been very much exploration, even in the summary judgment briefing, it was not very elaborately treated. Maybe that should be done by the district court first. Your Honor, if, of course, this court has decided fair use as a matter of law, for example, the Google v. Oracle case, but I'm not suggesting that the court couldn't or shouldn't remand. I do think there's not a lot of dispute about the underlying facts in terms of what's in the label. One of the kinds of facts that was discussed earlier, I think Judge Stoll asked you about, is there's something of a mystery about what's been happening for the last, say, 14 years since FMC and 30 years since 1988, and has this been really a practical problem? And somewhere near the core, I think, of your argument about FIFRA is that this really is a serious practical impediment to the EPA doing what Congress wants it to do. And I guess I have some uncertainty about just how reliable that is. Well, Your Honor, of course, the United States has taken the position in subsequent copyright litigation that has been brought against the generics that FMC was wrongly decided. How many cases? There are at least two that I'm aware of. There are declarations from those cases at Appendix 1165 and Appendix 1175 in the record here. Weren't those cases settled? Those cases, I believe the cases settled. I know there weren't appeals from those decisions. They may have been appealed and then settled. That was true in the FMC decision as well. But the point here is that generics reading the statute, of course, understand, as Congress intended, the whole idea was to copy the brand name label because EPA has spent a lot of resources making sure the brand name label is effective at communicating information. You don't want pesticide users to buy a pesticide with the same active ingredient and pick up a label and wonder why it's different. Why wouldn't the Fair Use Doctrine be a sufficient safeguard here in this case, an escape patch, a legislative escape patch in order to prevent copyright actions in these type of cases? And, Your Honor, to be clear, we think it could, and it's because of many of the same principles that underline our top line argument. Now, of course, we think the court can resolve this case the way the Second Circuit did in Smith, Klein, Beecham without reaching fair use and harmonize the statutes to find that the Copyright Act yields in these very narrow circumstances given the language in FIFRA. But if the court were not to do that for the reason that FIFRA encourages the generics to use identical or substantially similar labels and they're doing so to comply with the statute, that would be a reason to find fair use in these circumstances. Okay. We've got your argument. Mr. Levine, I gave you plenty of time during your direct. You reserved eight, but can you take four? Take four minutes. I'll try to take even less, Your Honor. Let me first just respond to Judge Toronto with respect to your question for the specific page number. As Judge Stoll pointed out, page 25 is the answer. The heading on page 25 is, The District Court erred as a matter of law in holding that FIFRA precludes Syngenta's copyright claims. The first sentence then set forth the District Court holding. The second sentence says that despite stating that copyright protection is precluded for the required elements of pesticide labels, the District Court granted Willowood's motion for summary judgment on Syngenta's copyright claims. Dropping a footnote, the footnote explains the difference between the required elements, non-required elements, and then the very next sentence on page 55 makes specific reference to the District Court creating a judicial exception to copyright protection for pesticide labels in their entirety. With respect to the issue that the government argued about this creating a problem, as Judge Stoll, you pointed out, it's been a substantial time since FMC. There hasn't been a logjam of litigation. The amici generics pointed out... Are you aware of any litigation other than that identified by the government? I am aware of the statement in the amici generics brief in which they said in a few instances there was litigation and in all instances they've been able to reach a resolution. Just a handful of litigation. One thing that's very interesting... Can I just ask you, do you have any reason to think that that's because at least since the government, pretty fast after FMC said we think this is wrong, that the pioneer companies have said these copyright claims, they're really not worth much and so we're not going to press it much? No, I think that there's so many different ways that one can express the various components of the label that these companies who oftentimes almost as a regular course work with regulatory consultants, they come up with their own language to distinguish themselves. It's a rare case like we have here with Willowood where they copied verbatim and initially didn't even change the name of Syngenta to Willowood. So I think that the companies within the industry are able to paraphrase and come up with their own language. But I can ask, what remedies, assuming you found you've got a copyright liability verdict, what are the remedies that either you have sought or would be seeking? Well, there could be statutory damages under the Copyright Act. So that would be what, minimum of $750 per label? Well, depending upon how that's interpreted in terms of whether it's per label or one label as applied to the entirety of a particular product, there could be other damages or it could just be equitable relief to prevent the copying and the use of an infringing label. And do you think an injunction would be warranted if it was, as I think it's the premise of your view, that with enough effort they could fiddle with the words of their label and get a non-infringing one? An injunction in those circumstances against the marketing of the product, really? Well, I think the injunction would prevent the copying to the extent that they can design around, just like you can in patent context if they design around in the injunction. And what about lost profits or actual damages or disgorgement of their profits on the assumption that they could have done the label perfectly properly? Those are available remedies, but we never got to that point at the district court level because the case was dismissed at summary judgment. Going back to the injunction question, I presume that you'd have to balance all the factors that are required for an injunction, public interest, all those different things as well in the copyright cases. Correct. Yeah, the equitable factors is set forth in eBay. And the government's arguments are really policy arguments at bottom. If they believe that there are problems with them being able to comply with what is set forth in the statute, those are issues that need to be fixed, addressed to, and fixed by Congress. Let's look at what happened as set forth in the... Well, Cal, I'm going to ask that you conclude. You're over your time again. Okay. The point I was going to make was simply that when there was a log jam based on the data comp revisions, Congress stepped in relatively quickly with the 1978 amendments and created binding arbitration quickly solving the problem. So the problem the government perceives should be addressed to Congress and let them address it. Thank you. Okay, thank you. We thank all the parties for their arguments this morning. This court will now be in recess. All rise.